Case 3:04-cv-01966-H-POR   Document 1   Filed 09/29/04   PageID.1   Page 1 of 19

USDC SCAN INDEX SHEET










```
GEP     9/29/04    13:48
3:04-CV-01966   SEC V. ROKE
*1*
*CMP.*
```

ORIGINAL

FILED

MICHAEL A. PIAZZA, *pro hac vice*
MOLLY M. WHITE, Cal. Bar No. 171448
DIANA K. TANI, Cal. Bar No. 136656          SEP 29 AM 10:18
FINOLA HALLORAN, Cal. Bar No. 180681
AMY M. HAWKES, Cal. Bar No. 227163

Attorneys for Plaintiff
Securities and Exchange Commission                    DEPUTY
Randall R. Lee, Regional Director
Sandra J. Harris, Associate Regional Director
Briane Nelson Mitchell, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MARCY WILSON ROKE,<br><br>Defendant. | Case No. 04CV1966 H (POR)<br><br>BY FAX<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### JURISDICTION AND VENUE

1.  This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

2. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3. This is a financial fraud case involving Advanced Marketing Services, Inc. ("AMS"), a San Diego-based wholesaler of general interest books that provides other book-related services, including advertising. From at least 2000 to 2003, AMS manipulated its earnings to meet Wall Street analysts' expectations and made misleading disclosures in its periodic reports, through at least two fraudulent schemes related to its advertising services. Defendant Marcy Wilson Roke ("Roke"), a director in AMS's advertising department, was one of the individuals who instigated and participated in the fraudulent schemes.

4. In the first fraudulent scheme, AMS improperly manipulated its earnings by producing fewer advertising vehicles than it had contracted with publishers to provide. One advertising service that AMS provides to publishers is to print and mail advertising vehicles -- such as inserts, catalogs, and post-cards -- for books the publishers produce. AMS improperly recognized revenue on the full quantity of advertising vehicles that it had agreed to distribute, because it did not in fact produce the number of vehicles that it had contracted to produce.

5. In the second fraudulent scheme, AMS improperly increased its reported earnings by reversing certain liabilities when it was not entitled to do so. AMS had accrued a liability for credits that it expected its retail customers to take for certain advertising and promotional services that those customers provided. When the retail customers did not take the credits that were due to them, instead of contacting the retailers and reconciling the amounts of the credits, Roke and others directed advertising and sales personnel to hide the discrepancies from the retailers. Advertising personnel, which at times included Roke, then directed

1  accounting personnel to reverse the liability, which in turn reduced expenses,
2  thereby ensuring that the advertising department achieved or exceeded its budget.
3      6.   Roke knew that the inflated advertising department numbers had a
4  significant impact on AMS's bottom line and that they would impact AMS's
5  financial statements. Roke profited from the fraudulent schemes through her
6  annual bonuses and through her sales of AMS stock during the relevant period.
7      7.   As a result of the defendant's improper actions, from the fourth
8  quarter of fiscal year 2002 through the fourth quarter of fiscal 2003, AMS met or
9  exceeded analysts' earnings estimates every quarter except one.
10     8.   As alleged more specifically below, Roke violated the antifraud,
11 record-keeping, and books and records provisions of the federal securities laws.
12 By this complaint, the Commission seeks to enjoin the defendant from future
13 violations of the federal securities laws, to obtain disgorgement of all benefits the
14 defendant received from her violations, and to obtain civil penalties.

**THE DEFENDANT**

16     9.   Marcy Wilson Roke, age 37, resides in San Diego, California. Roke
17 was the Director of Advertising at AMS from 1999 until 2004. During that time,
18 she reported to the Vice President of Advertising. Before then, she was a Senior
19 Advertising Manager at AMS. AMS terminated Roke in June 2004.

**RELATED ENTITY**

21    10.   AMS is a Delaware corporation, headquartered in San Diego,
22 California. AMS is a wholesaler of general interest books to membership
23 warehouse clubs, specialty retailers, e-commerce companies, and traditional book
24 stores. AMS's common stock is registered with the Commission pursuant to
25 Section 12(b) of the Exchange Act and has been listed on the New York Stock
26 Exchange under the ticker symbol "MKT" since November 2000. Before then,
27 AMS's common stock was registered with the Commission pursuant to Section
28 12(g) of the Exchange Act and was traded on the Nasdaq National Market System

- 3 -

under the symbol "ADMS."

## BACKGROUND

11. AMS purchases books from a variety of publishers on a returnable, wholesale basis and resells them to retailers, which include book stores and wholesale clubs. In addition to being a wholesale distributor of books, AMS provides other services to its customers, including product-selection advice, merchandising and product development services, distribution services, and advertising and promotion services.

12. For its fiscal year ended March 31, 2003, AMS reported pre-tax earnings of $18 million and revenues of $911 million. From fiscal year 2001 to 2003, AMS's revenues grew from $713 million to $911 million.

13. Although AMS's promotion and advertising services constituted just two to three percent of AMS's revenue, the advertising department accounted for at least 20% of AMS's pre-tax earnings, primarily due to the large profit margins generated by AMS's advertising department.

### A. AMS's Reporting Obligations and Public Announcements

14. As a public company, AMS was required to comply with federal statutes, rules, and regulations to maintain public trading of its stock and to sell its securities to the public.

15. These statutes, rules, and regulations required AMS to, among other things: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of assets; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements and to maintain accountability for assets; (c) file with the Commission quarterly reports on the appropriate form (known as a "Form 10-Q") including a financial

- 4 -

1 statement containing the company's balance sheet and statements of income and
2 cash flows prepared in conformity with GAAP; (d) file with the Commission
3 annual reports on the appropriate form (known as a "Form 10-K") including a
4 financial statement containing the company's balance sheet and statements of
5 income and cash flows prepared in conformity with GAAP; and (e) file with the
6 Commission periodic reports that did not make any untrue statement of material
7 fact or omit to state a material fact necessary in order to make the statements made,
8 in the light of the circumstances under which they were made, not misleading.

9     16.    Under GAAP and the Commission's rules and regulations, AMS
10 recorded and reported income for specific periods (i.e., at the end of each quarter
11 and at the end of its fiscal year). AMS's fiscal year began April 1 and ended March
12 31. In fiscal year 2001, AMS's first quarter ended June 30, 2000; its second quarter
13 ended September 30, 2000; its third quarter ended December 31, 2000, and its
14 fiscal year ended March 31, 2001. In AMS's fiscal year 2002, its first quarter
15 ended June 30, 2001; its second quarter ended September 30, 2001; its third quarter
16 ended December 31, 2001, and its fiscal year ended March 31, 2002. For AMS's
17 fiscal year 2003, AMS's first quarter ended June 30, 2002; its second quarter ended
18 September 30, 2002; its third quarter ended December 31, 2002, and its fiscal year
19 ended March 31, 2003.

20     17.    In addition to filing quarterly and annual reports with the Commission,
21 AMS also issued earnings press releases and held conference calls with analysts
22 and investors to discuss AMS's financial performance on a periodic basis, usually
23 after the end of a quarter and before AMS made its periodic filings with the
24 Commission.

25     18.    Under GAAP and the Commission's rules and regulations, AMS could
26 recognize revenue from the advertising services that it provided once AMS
27 substantially completed the advertising services that it was supposed to perform in
28 order to be entitled to those revenues.

19. Under GAAP and the Commission's rules and regulations, AMS should accrue and record a liability when the underlying obligation to provide an asset or service was deemed probable and reasonably estimable. GAAP also requires that a recognized liability be measured at the amount initially recorded until an event that changes the liability or its amount occurs.

### B.   Cooperative Advertising

20. Virtually all of AMS's advertising revenue was generated though cooperative ("coop") advertising programs, pursuant to which publishers make available advertising dollars to promote their books. AMS participates in two types of coop advertising programs: 1) wholesale coop advertising; and 2) retail coop advertising.

21. Wholesale coop advertising is a program through which publishers offer a pool of funds directly to AMS to be used to promote the publishers' books to industry insiders, such as store managers and book buyers employed by retailers. The funds that publishers make available to AMS for wholesale coop advertising are generally based on AMS's prior year's net purchases. Before using the funds, AMS is required to obtain publisher approval. Thus, when AMS develops an advertising concept, it sends the publisher an advertising request. Once the publisher approves the advertising request, it becomes a contract between AMS and the publisher. After AMS creates the artwork, prints the vehicle, and directs a mailing house to distribute the advertising vehicle, AMS invoices the publisher for the advertising vehicle and recognizes revenue for that service.

22. Retail coop advertising is similar to wholesale coop, except that the funds are made available for use by a retailer (instead of a wholesaler) to advertise books to end-consumers (instead of industry insiders). The amount of retail coop funds that a publisher makes available to a particular retailer usually is based on the retailer's net purchases of that publisher's titles. Similar to wholesale coop, either AMS or the retailer creates an advertising concept. If the retailer and AMS agree

1  on the advertising concept, AMS sends an advertising request to the publisher.
2  Upon receiving the publisher's approval, AMS creates the artwork, prints the
3  advertising vehicle, directs a mailing house to mail the advertisement to the end-
4  customers, and bills the publisher.

5      23.   A retailer is not required to use its coop advertising funds to obtain
6  advertising from AMS. Because retail coop dollars belong to the retailers, there are
7  instances when retailers do not spend their retail coop dollars with AMS, but
8  provide all or some of the promotional service themselves. In instances where the
9  retailers provide the advertising service, many retailers will invoice the publisher
10 through AMS, because in addition to creating advertisements, AMS keeps an
11 accounting of the retail coop funds and provides publishers with the sales
12 information necessary to calculate the funds available to the retailer. When a
13 retailer decides to use its retail coop dollars for a particular promotion using AMS,
14 it notifies AMS that this is how it intends to use its retail dollars. AMS then
15 obtains approval from the publisher. Once the publisher approves the promotion,
16 AMS communicates the approval to the retailer and invoices the publisher. The
17 retailer is then supposed to invoice AMS for the service. In this way, some
18 advertising costs are "passed through" AMS from the retailers to the publishers.

19 <center>**THE FRAUDULENT SCHEMES**</center>

20     24.   For at least the past three years, AMS manipulated its pre-tax
21 earnings and made misleading disclosures in public filings, press releases, and
22 conference calls, through different fraudulent schemes involving both its
23 wholesale coop and retail coop advertising programs.

24 **A.   Quantity Reductions**

25     25.   In 2000, the advertising department was at risk of failing to meet its
26 budget. As a result, Roke and other advertising personnel devised and
27 implemented a scheme to cut quantities, so that the advertising department would
28 make or exceed its budget. Roke and other advertising personnel decided they

<center>- 7 -</center>

could meet the budget by cutting their costs, and that they could cut costs by printing fewer advertising vehicles than they had agreed to provide their publishers. This practice evolved into a regular course of business in the department.

26. Beginning in 2000 and continuing into 2003, in order to meet the advertising budget and respond to pressure from AMS senior executives for more earnings, the advertising department routinely printed and distributed fewer advertising vehicles than AMS had contracted to provide. This occurred in both the wholesale and the retail coop programs. Roke participated in the scheme by obtaining quotes from printers for various print quantities, so members of the advertising department could decide the amount of vehicles to reduce. Roke instructed individuals in her department to print fewer advertising vehicles than AMS had contracted with its publishers to print, without changing the quantity terms on the contracts with the publishers.

27. For example, in the wholesale coop context, by at least September 2000, AMS was informing publishers that its circulation for one of its wholesale advertising vehicles, "Pages" magazine, was 100,000 when it was substantially less than that. In September 2000, AMS printed only 55,000 copies of "Pages," even though AMS's contracts with publishers and AMS's webpage indicated that the circulation was 100,000. In some months, AMS printed as few as 8,000 copies of "Pages."

28. Similarly, in the retail coop context, AMS systematically sent advertising post cards to fewer warehouse club members than it agreed. For example, in about March 2000, AMS informed publishers that it would send one SAM's Club post card to 200,000 of SAM's Club's members, but AMS only printed 50,000 of those cards.

29. Reducing quantities became such standard business practice that the advertising department made little attempt to hide the practice. All documentation

- 8 -

1  pertaining to a particular advertising vehicle, including the advertising contracts,
2  the invoices from the printer, and the mailing house invoices, was kept in one
3  promotion folder. As an advertising promotion was processed, the promotion
4  folder was passed from person to person in the advertising department and
5  ultimately provided to Roke, who approved the vehicles by signing the outside of
6  the folders before they went to the accounting department. A signature on the
7  promotion folder was an indication that the accounting department could invoice
8  the publisher for the vehicle.

    30.    The advertising department's deliberate quantity reductions from contracted amounts caused a revenue recognition practice that was improper under GAAP because AMS failed to substantially accomplish its duties under its contracts -- namely to produce the agreed-upon number of advertising vehicles. As a result, AMS overstated its earnings, and its quarterly and annual financial statements did not conform with GAAP.

**B.    <u>Improper Accrual Reversals</u>**

    31.    AMS inflated its advertising income by improperly reversing accrued liabilities related to retail coop advertising. As previously alleged, when a retailer provided all or part of an advertising service and the advertising cost was "passed through" AMS to the publisher, AMS would invoice the publisher for the cost of the promotion and wait for the retailer to take a credit on its book purchases from AMS. Because the retailer was owed a credit, AMS would record an offsetting liability for the anticipated credit in an accrued liability account called "accrued coop." When AMS received notice that a retailer was using the credit, AMS credited the retailer and reduced the corresponding liability from the "accrued coop" account.

    32.    Retailers often failed to take credits for their advertising costs. This was largely due to a lack of communication between the retailers' sales people, who arranged for the various promotions, and the retailers' accounting group,

- 9 -

1  which invoiced those services. Thus, there often were discrepancies between what
2  AMS accrued and what retailers deducted.
3        33.    From at least 2000, members of the advertising department used the
4  pool of coop accrued liabilities to meet the advertising budget without reaching
5  settlement with the retailers. When the end of a quarter drew near, the person in
6  the accounting department who was responsible for coop advertising provided the
7  advertising department with a list of outstanding coop accruals. Then advertising
8  department personnel would identify which accrued liabilities should be removed
9  from the "accrued coop" account, even though AMS had not reached settlements
10 regarding those accruals. By reversing the accrued liability, AMS reduced the
11 corresponding expense on its income statement, thereby overstating earnings. In
12 this way, the advertising department created the false appearance that it was
13 making or exceeding its budget.
14       34.    From at least 2000, Roke knew that the advertising department was
15 improperly reversing coop advertising accrued liabilities, and sometimes assisted
16 in perpetration of the fraud. At times, Roke was consulted about which credits the
17 retailers would most likely fail to take, and consequently which accruals to
18 reverse.
19       35.    In order to maximize the pool of "accrued coop," AMS adopted the
20 practice of intentionally refraining from giving retailers information about the
21 credits due to them. The often-repeated motto among AMS executives was "we
22 are not our customers' accounting departments." In other words, if the retailers did
23 not accurately track the credits due to them, AMS was not going to help. As the
24 coop advertising accountant stated in an email: "Our policy has always been . . .
25 WE NEVER ISSUE A CREDIT TO A CUSTOMER UNTIL THEY TAKE IT."
26 Roke directed individuals in AMS's advertising and sales departments to withhold
27 from AMS's retailers information about credits due to them, even when retailers
28 called to ask about outstanding credits. As a result of this conduct, Roke assured

- 10 -

1  that there was no documentation to support the accruals and the accrual reversals.

2  36. AMS did not have operating and accounting policies outlining the
3  procedures for the reversal of coop cost accruals that retailers did not utilize.
4  Roke knowingly caused coop accounting accruals to be reversed to income, by
5  helping identify which accruals should be reversed, even though she knew that
6  there was no documentation supporting the reversals.

7  37. The advertising department's reversal of coop accruals did not
8  conform to GAAP. Although AMS initially properly recorded the coop accrued
9  liabilities, the advertising department improperly reduced those liabilities and the
10 corresponding expenses without contacting retail customers or attempting to reach
11 settlement with them, in an effort to manipulate the advertising department's
12 earnings, and ultimately AMS's earnings. These reductions in the coop accrued
13 liability account were improper because no corresponding event occurred that
14 changed the amount of the liability. Rather, they were arbitrarily and improperly
15 reversed at the direction of Roke and others in the advertising department. As a
16 result, AMS's quarterly and annual financial statements did not conform with
17 GAAP.

18 **C.   Pressure to Meet Budget**

19 38. Roke was aware that an AMS executive put pressure on the
20 advertising department to make budget, because Roke was sometimes present
21 when the executive pressured advertising department personnel. A senior member
22 of the advertising department also periodically met with members of the
23 department to discuss expectations for the quarter, as compared to budget.

24 39. In order to keep track of how the advertising department was
25 performing as compared to budget, the department kept a "crib sheet," which was
26 updated at least weekly. The "crib sheets" tracked AMS's actual profit on
27 individual advertising promotions, by retailer and month, and compared that
28 number to the budgeted monthly profit for each retailer. The spreadsheets also

had a line item that reflected coop advertising accrual reversals. Roke occasionally helped update the crib sheet. The crib sheet was shared with an AMS executive on a weekly basis.

### D. Scienter

40. Roke had the requisite scienter. Roke helped carry out the two fraudulent schemes for the sole purpose of manipulating the advertising department's results, so it would appear that the advertising department was making or exceeding its budget. The decision to instigate the fraud was the result of pressure from AMS executives for additional advertising income.

41. Roke knew that the advertising department's financial performance impacted AMS's financial statements. Indeed, Roke commented that anyone looking at AMS's Form 10-K would have no idea how much money the advertising department contributed. When AMS issued its earnings releases, Roke discussed the fact that the press releases said nothing about the advertising department's contribution to AMS's bottom line.

42. In late February 2003, an employee in AMS's advertising department discovered the discrepancies between the number of advertising vehicles that AMS contracted to distribute and the number of vehicles that AMS actually distributed. On February 24, 2003, the employee mentioned the quantity variances in a meeting with Roke, who was her direct supervisor, and a senior manager in the advertising department. During the meeting, the employee showed Roke and another manager the advertising promotions she had managed, pointing out that the publisher had signed a contract in good faith and that AMS had provided fewer advertising vehicles than represented in the contract. Roke said nothing while the other manager confirmed that AMS was going to print and mail fewer advertising vehicles than it had contracted to provide.

### E. Materiality

43. Roke's fraudulent conduct had a material impact on AMS's financial

- 12 -

statements. By producing fewer advertising vehicles than contracted, and by improperly reversing coop advertising accruals, Roke caused AMS to improperly inflate its revenue and earnings. Because the advertising department accounted for nearly 25% of AMS's pre-tax earnings, the impact was sizeable. The estimated overstatement of pre-tax earnings was 9% in fiscal year 2001, 10% in fiscal year 2002, and 19% in fiscal year 2003.

F. **Roke Profited During the Fraud**

44. Roke profited from her participation in the schemes. During the relevant period, Roke received annual bonuses and sold shares of AMS stock.

45. During her perpetration of the fraud, Roke executed and sold stock options through her and her husband's joint brokerage account. On June 13, 2000, Roke executed options and sold 1,500 shares at $18.50 per share for a total sale of $27,750. On February 5, 2001, she executed 1,500 options and sold them for $19.80 per share for a total sale of $29,700. On February 28, 2001, she executed 1,500 options and sold them for $20.05 per share for a total of $30,075. On February 14, 2002 she executed 3,375 options and sold them for $21.00 per share for a total of $70,875, and on February 15, 2002 she executed another 3,375 options and sold them for $23.00 per share for a total of $77,625. Roke's stock sales during the relevant period totaled $236,025. At the time Roke exercised these options and made these sales, the price of AMS stock was inflated due to AMS's overstated earnings, which were caused in part by Roke's misconduct.

46. When Roke sold her AMS stock, she knew that AMS's publicly available earnings information was materially overstated.

## FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

**Violations of Section 17(a) of the Securities Act**

47. The Commission realleges and incorporates by reference ¶¶ 1 through 46 above.

- 13 -

48. Defendant Roke, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a. with scienter, employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

49. By engaging in the conduct described above, defendant Roke violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE
## PURCHASE OR SALE OF SECURITIES
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 thereunder

50. The Commission realleges and incorporates by reference ¶¶ 1 through 46 above.

51. Defendant Roke, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of a material fact or omitted to state a

- 14 -

        material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

52.    By engaging in the conduct described above, defendant Roke violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF
## RECORD-KEEPING VIOLATIONS
### Aiding and Abetting Violations of
### Section 13(b)(2)(A) of the Exchange Act and
### Violations of Rule 13b2-1 thereunder

53.    The Commission realleges and incorporates by reference ¶¶ 1 through 46 above.

54.    AMS violated Section 13(b)(2)(A) of the Exchange Act and Rule 13b2-1, thereunder, by failing to make or keep books, records, and accounts in reasonable detail that accurately and fairly reflected its transactions and disposition of its assets and by falsifying or causing to be falsified AMS's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act.

55.    Defendant Roke knowingly provided substantial assistance to AMS's violation of Section 13(b)(2)(A) of the Exchange Act.

56.    By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendant Roke aided and abetted AMS's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

57. By engaging in the conduct described above, defendant Roke violated Exchange Act Rule 13b2-1 by, directly or indirectly, falsifying or causing to be falsified AMS's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act. Unless restrained and enjoined, defendant Roke will continue to violate Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

## FOURTH CLAIM FOR RELIEF
## BOOKS AND RECORDS VIOLATIONS
### Violations of Section 13(b)(5) of the Exchange Act

58. The Commission realleges and incorporates by reference ¶¶ 1 through 46 above.

59. By engaging in the conduct described above, defendant Roke violated Section 13(b)(5) of the Exchange Act, by circumventing or failing to implement a system of internal accounting controls, or by knowingly falsifying any book, record or account described in Section 13(b)(2) of the Exchange Act. Unless restrained and enjoined, defendant Roke will continue to violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that defendant Roke committed the alleged violations.

### II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining defendant Roke and her officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, Sections 10(b), 13(b)(2)(A) and 13(b)(5) of the Exchange Act, and Rules 10b-5 and 13b2-1

- 16 -

1 | thereunder.

### III.

Order defendant Roke to disgorge all ill-gotten gains from her illegal conduct, together with prejudgment interest thereon.

### IV.

Order defendant Roke to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:   September 29, 2004

*/s/ Molly M. White*
Molly M. White
Attorneys for Plaintiff
Securities and Exchange Commission

**ORIGINAL**
**BY FAX**

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**   '04 SEP 29 AM 10:16

MARCY WILSON ROKE   '04 CV 1966 H POR

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** SAN DIEGO
BY: (IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Molly M. White   323-965-3250
Securities & Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA 90036-3648

**ATTORNEYS (IF KNOWN)**

Frank Vecchione   619-231-3653
Law Offices of Frank Vecchione
105 W. F Street, Suite 215
San Diego, CA 92101

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES U

The Complaint alleges violations of the federal securities laws. 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 thereunder; 15 U.S.C. § 78m(b)(2)(A) and 17 C.F.R. § 240.13b2-1; and 15 U.S.C. § 78m(b)(5).

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 750 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p 23   **DEMAND $**   Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions): JUDGE _____ Docket Number _____

DATE 9-29-04   SIGNATURE OF ATTORNEY OF RECORD _Molly M. White_

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)